255 N.J. Super. 108 (1992)
604 A.2d 657
THEODORE FLEMING, PLAINTIFF,
v.
UNITED PARCEL SERVICE, INC., JULIO CASTELLANOS, DENNIS O'KEEFE, RONALD FOX, WILLIAM ROGALSKY, WALTER M.D. KERN, ATLANTIC AREA PARCEL GRIEVANCE COMMITTEE AND AL BARLOW AND JOHN DOES, MEMBERS OF THE ATLANTIC AREA PARCEL GRIEVANCE COMMITTEE, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided January 22, 1992.
*120 Angelo R. Bianchi for plaintiff.
Edward P. Lynch for defendants United Parcel Service, Inc., Ronald Fox and Dennis O'Keefe (Pitney, Hardin, Kipp & Szuch, attorneys).
Barbara Weisman for defendant Walter M.D. Kern (Samuel A. DeGonge, attorney).
Martin Wald for defendant Atlantic Area Parcel Grievance Committee (Crummy, DelDeo, Dolan, Griffinger & Vecchione and Schnader, Harrison, Segal & Lewis of Pennsylvania Bar, attorneys; Kerry Parker, Martin Wald and Alex Johnson of the Pennsylvania Bar, on the brief).
Roland P. Wilder, Jr. for defendants Atlantic Area Parcel Grievance Committee, its non-company members and Al Barlow (Tomar, Simonoff, Adourian & O'Brien and Baptiste & Wilder of District of Columbia Bar, attorneys; Justin T. Loughry and Roland P. Wilder, Jr. of District of Columbia Bar, on the brief).

OPINION
VILLANUEVA, J.S.C.
After an arbitration panel upheld plaintiff's discharge from employment on the grounds of dishonesty and after the termination of criminal complaints against him, he filed this action for interference with his contractual rights, slander, suffering severe emotional distress and six counts dealing with the prosecution of criminal charges against him.
Plaintiff's grounds for relief are primarily that the Arbitration Panel established under the collective bargaining agreement, which waited almost two years until the disposition of the criminal complaints in the municipal court, wrongfully refused to delay its proceedings until the completion of plaintiff's trial de novo in the Superior Court. Plaintiff also contends that the municipal court proceedings were tainted by all defendants *121 because the municipal prosecutor was compensated by plaintiff's former employer.
The court holds that all plaintiff's causes of action except one slander charge are barred for various reasons, such as federal preemption, statutes of limitation, privilege, arbitral immunity, prosecutorial immunity and Tort Claims Act immunity. Furthermore, Opinion 523 of the Supreme Court Committee on Attorney Ethics permits a municipal prosecutor to be compensated by a complaining person.

PRELIMINARY STATEMENT
On December 27, 1989, plaintiff Theodore Fleming ("Fleming") filed a ten count complaint against his former employer, United Parcel Service, Inc. ("UPS"), four of its employees, Ronald Fox, Dennis O'Keefe, Julio Castellanos[1] and William Rogalsky[2], the Atlantic Area Parcel Grievance Committee, ("Arbitration Panel"), Al Barlow, a member of the Arbitration Panel, "John Doe" members of the Arbitration Panel, and Walter M.D. Kern, former municipal prosecutor of the Township of Saddle Brook, New Jersey. The complaint is based upon Fleming's discharge from employment by UPS on March 3, 1986 on the grounds of dishonesty, the Arbitration Panel's upholding of his discharge, and the prosecution of him for theft and assault on criminal complaints signed by Fox, O'Keefe and Castellanos with the knowledge and approval of UPS.
Two counts of the complaint deal with Fleming's discharge from employment and the Arbitration Panel's upholding of that discharge. Fleming alleges in the Second Count that the Arbitration Panel refused to delay his discharge arbitration hearing until an appeal of his municipal court conviction had been decided contrary to public policy and in violation of his contractual *122 rights under a collective bargaining agreement between UPS and Local Union No. 177, affiliated with the International Brotherhood of Teamsters ("Local 177"). Fleming alleges in the Fifth Count that all defendants interfered with his contractual rights under the same collective bargaining agreement.[3] Defendants contend that both of these claims are governed by federal substantive law. These allegations involve the Arbitration Panel's decision upholding Fleming's discharge. Count Two alleges that the Arbitration Panel, Al Barlow and other "John Doe" members of that committee acted wrongfully by proceeding with his discharge hearing during the pendency of his appeal from a municipal court conviction. Count Five alleges that the Arbitration Panel, Al Barlow and other "John Doe" members of that committee interfered with his contractual rights by proceeding with his discharge hearing.
Six counts of the complaint deal with the criminal charges lodged against Fleming and the prosecution of those charges. Fleming alleges false arrest against UPS, Fox, O'Keefe, Castellanos and Rogalsky (Eighth Count), and malicious prosecution against those defendants and Kern (Sixth Count). He also alleges that UPS made, and Kern accepted, payment for services in connection with Kern's prosecution of the criminal charges against him in the Saddle Brook Municipal Court, which payments he asserts were illegal. (Third and Fourth Counts). In addition, Fleming alleges misuse [abuse] of process in connection with his criminal prosecution (Seventh Count), and denial of the constitutional right to a speedy trial (First Count) against UPS, Fox, O'Keefe, Castellanos, Rogalsky and Kern.
Fleming also claims that defendants have slandered him (Ninth Count) and that he has suffered severe emotional distress (Tenth Count).
*123 All defendants move for summary judgment to dismiss the complaint.

FINDINGS OF FACTS
Acting pursuant to a customer complaint, UPS loss prevention specialists set up a surveillance of certain packages at their Saddle Brook facility in March 1986. On March 3, 1986, during this surveillance they observed Fleming, a UPS employee truck driver, place the packages in his UPS vehicle. When confronted, Fleming sped off with UPS Loss Prevention Manager Fox literally hanging from the vehicle. Despite Fox's protests, Fleming continued to accelerate, nearly running over two other loss prevention specialists, defendants Castellanos and O'Keefe. The UPS employees positively identified both Fleming and his vehicle. This was a finding in the written opinion of the Honorable John A. Conte, Judge of the Municipal Court of the Township of Saddle Brook. Nevertheless, Fleming still denies these allegations.
Fleming was confronted by the loss prevention specialists at UPS's Secaucus facility later on March 3, 1986. Also on that day a discharge hearing was held pursuant to the collective bargaining agreement then in effect between UPS and Fleming's union representative, Local 177. The hearing was attended by Fleming, alternate union steward John Jennings, Fox and Rogalsky, who was Feeder Division Manager of UPS's Saddle Brook facility at the time of Fleming's arrest. Fleming contends that Rogalsky told him that if he resigned his employment, he would not be prosecuted. When Fleming refused to resign, he was informed by letter from Rogalsky dated March 4, 1986 that his employment was terminated for committing a dishonest act.
On March 3, 1986 Fleming was arrested and charged with three counts of aggravated assault and one count of theft over $200. The theft charge was signed by Castellanos, and the assault charges were signed by Castellanos, O'Keefe and Fox. *124 The arrest was effected by officers from the Secaucus Police Department, who later turned Fleming over to the Saddle Brook Police. The Bergen County Prosecutor's Office downgraded the charges to theft under $200 and simple assault, and the matter was then referred to the Saddle Brook Municipal Court. An initial trial date was set for June 9, 1986.
Fleming was represented for purposes of collective bargaining by Local 177. He had certain rights under a collective bargaining agreement, which contained a discharge provision and a binding grievance and arbitration procedure. Fleming filed a grievance protesting his discharge which was processed by Local 177. Under UPS's agreement with Local 177 unresolved discharge grievances were heard by the Arbitration Panel. The Arbitration Panel consisted of three Teamster Union representatives, three UPS representatives and a neutral arbitrator who ruled only when the other six Arbitration Panel members were deadlocked.
While UPS was ready to proceed before the Arbitration Panel with its discharge case against Fleming, the matter was forestalled by the refusal of the three Union Arbitration Panel members to proceed. This refusal was caused by Local 177's request that the Arbitration Panel not proceed during the pendency of Fleming's criminal trial, which request was also made by Fleming and his attorney.
During an appearance in Saddle Brook Municipal Court in June of 1986, Municipal Prosecutor Walter M.D. Kern ("Kern") advised Fox and Rogalsky that the Fleming case would have to be tried on nonregular court dates (regular dates were Wednesday evenings), and that he (Kern) received no compensation for such dates. He told them that they could retain him at $150 per hour for services for his preparation and appearances on non-regularly scheduled court dates, retain another attorney to prosecute the case or attempt to get the county prosecutor to do it. They agreed to retain Kern and pursuant thereto Kern submitted bills for services to UPS which were paid by UPS.
*125 The criminal trial against Fleming, which began on December 4, 1986, was initially prosecuted by Kern. When Kern was disbarred, due to unrelated complaints, effective December 1987, Scott E. Smith, an associate with Pitney, Hardin, Kipp & Szuch, took over the prosecution of the case against Fleming. The trial testimony concluded on April 25, 1988.
In June 1988 Judge Conte found Fleming guilty of theft, but not guilty of the assaults on the ground that "... there is some doubt, although slight, that defendant intended to commit an assault on anyone rather than flee the scene as quickly as possible."
On June 26, 1988 Fleming's attorney wrote to defendant Barlow stating that Fleming had been found guilty of theft, that Judge Conte's written opinion was expected on July 27, 1988 and that there would be an appeal of Fleming's conviction. He once again requested that the Arbitration Panel not proceed with Fleming's discharge case.
Local 177, at Fleming's request, repeatedly sought continuances, and the Union members of the Committee declined to hear the case for two years. On July 5, 1988, after the conclusion of Fleming's trial in Municipal Court, he was warned by Local 177:
Please be advised that our Local Union supports your position to continue to hold your discharge case before the Atlantic Area Parcel Grievance Committee in abeyance pending the outcome of your court appearance. However, the AAPGC may rule that your case must be heard on Tuesday, July 12, 1988 in Norfolk, Virginia, therefore, it is imperative that you come to our offices as soon as possible to prepare your case.
Nevertheless, Fleming did not appear at the July 12, 1988 hearing. The neutral arbitrator broke the procedural deadlock between the Union and Company members by ruling that the Fleming's discharge case must proceed to hearing. The Committee reasoned:
The panel, in postponing the case over the past approximately two years, has been implementing the advice of the parties' respective attorneys. As the panel has understood that advice, it was that the case should not be heard by the panel until the grievant had his day in court. The panel views that event to *126 have occurred because the trial has been held and the verdict has been rendered. The panel does not take any appeals proceedings to have been part of the understanding by which the case has been postponed. However, the panel believes that the case should continue to be held in abeyance until the trial judge has issued his written opinion, anticipated in late July. If that opinion is in fact issued by that time, the case is to be heard at the panel's scheduled August hearing.
Fleming's case was called on August 9, 1988. Although Local 177 had urged him to be present, he declined to attend on the advice of counsel. During the hearing, the Committee's questioning disclosed that Local 177 had not furnished plaintiff with a copy of the July 12th procedural ruling. It instructed the Local Union to cure its omission and to advise plaintiff of his right to appear and be heard at the Committee's next scheduled proceeding. If he appeared, the entire case (including UPS's evidence) was to be heard again; if he did not, the case was to be decided on the record made at the August 9, 1988 hearing. Fleming was notified of these rulings on August 11, 1988.
On August 11, 1988 Mario Perrucci, Secretary-Treasurer of Local 177, wrote Fleming advising him that the Arbitration Panel proposed to decide his case at its September 1988 session and that he could be heard in his own defense if he so chose. Perrucci concluded: "Please let us have your reply by the end of August, so that we may have adequate opportunity for preparing your defense should you choose to avail yourself of the opportunity to be heard."
Fleming's attorney responded on August 16, 1988, arguing that the Committee should not proceed because the matter had been appealed to the Superior Court. Under New Jersey law, he said, the Superior Court would review the matter de novo on the record made before the Municipal Court. Characterizing the case pending in the Superior Court as a "new trial", not an "appeal", he insisted that Fleming had a right not to appear before the Committee. The argument was rejected. When Fleming failed to appear at the September 13th hearing, the *127 Committee decided the case on the existing record, sustained his discharge, and notified him in September 1988.
Fleming appealed his municipal court theft conviction to the Superior Court, where his counsel argued that the delays experienced in the Saddle Brook Municipal Court proceeding violated Fleming's right to a speedy trial. Superior Court Judge Andrew P. Napolitano agreed, so, on March 15, 1989, he dismissed the complaint, without reaching the merits, based on a violation of Fleming's constitutional right to a speedy trial.
At all times relevant to this litigation, a collective bargaining agreement between UPS and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of American, Local 177 ("Local 177") governed the terms and conditions of plaintiff's employment with UPS ("Local 177 Agreement").
The Local 177 Agreement provides for immediate discharge of an employee for "proven or admitted dishonesty." The agreement sets forth a grievance machinery that "may be invoked only by authorized Union representatives." Furthermore, the agreement provides that all grievances arising out of any "controversy ... as to [its] interpretation, application or observance," shall "be heard by the [AAPGC] unless otherwise mutually agreed upon."
The AAPGC's Rules of Procedures provide: "Neither party shall be entitled to more than one postponement on any given case and there shall be no more than two (2) postponements for any reason on any given case."
Fleming acknowledges that the AAPGC postponed his discharge hearing more than twice and that a Local 177 official informed him that on the third attempt for postponement that he would have to abide by the AAPGC's decision. Fleming does not contend that the AAPGC violated any rules or procedures in hearing his case when it did.

*128 I.

PLAINTIFF'S CLAIM AGAINST UPS, FOX AND O'KEEFE FOR INTERFERENCE WITH HIS RIGHTS UNDER THE COLLECTIVE BARGAINING AGREEMENT IS DISMISSED AS A MATTER OF LAW.
Fleming alleges that the Arbitration Panel and its members, by failing to delay his discharge arbitration hearing until the conclusion of his appeal of his criminal conviction, violated his rights under the collective bargaining agreement and public policy and that his discharge as upheld by the Arbitration Panel was therefore unlawful. Fleming also alleges that all defendants interfered with his rights under the collective bargaining agreement, that his discharge was unlawful because the Arbitration Panel proceeded with his case and that his right to appear before the Arbitration Panel was somehow violated. Fleming recognizes that discharges from employment, such as his, are governed by the collective bargaining agreement and that contested discharges are resolved by the Arbitration Panel. Fleming's claims in the Second and Fifth Counts are based upon, and necessarily intertwined with, the collective bargaining agreement between Local 177 and UPS.

A. Plaintiff's Claims in the Second and Fifth Counts Are Governed by Section 301 of the Labor Management Relations Act and Must Be Assessed under Applicable Federal Law.

Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185(a) authorizes the federal courts to create a body of federal law for the enforcement of collective bargaining agreements. Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 450-451, 456, 77 S.Ct. 912, 914-915, 917, 1 L.Ed.2d 972 (1957). In Local 174, Teamsters, etc. v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the United States Supreme Court held that in suits involving collective bargaining agreements Section 301 mandates that substantive *129 principles of federal labor law are paramount, and state laws are preempted. Id. at 102-103, 82 S.Ct. at 576-577. The Court reasoned that "[S]tate law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy." Id. at 104, 82 S.Ct. at 577.
In a series of cases beginning with the "Steelworkers Trilogy" the United States Supreme Court held that grievance and arbitration procedures under collective bargaining agreements are enforceable under Section 301 and that suits involving those procedures are governed by the federal labor law developed under Section 301. United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
New Jersey has long recognized that in suits under Section 301 federal substantive law must be applied. Standard Motor Freight, Inc. v. Local Union No. 560, 49 N.J. 83, 86, 228 A.2d 329 (1967); Brooks v. New Jersey Manufacturers Ins. Co., 170 N.J. Super. 20, 30, 405 A.2d 466 (App.Div. 1979); Jennings v. M & M Transportation Co., 104 N.J. Super. 265, 275, 249 A.2d 631 (Ch.Div. 1969). Although such claims may be heard in a state forum, it is federal law which must be applied. Standard Motor Freight, Inc. v. Local Union No. 560, supra, 49 N.J. at 86, 228 A.2d 329.

B. Plaintiff's Complaint Does Not Touch on Interests Deeply Rooted in Local Concern.

Fleming's argument that New Jersey has a deeply rooted interest in adjudicating claims for tortious interference with contract misses the mark. Any examination of New Jersey's *130 interest must be limited by the context of this claim, i.e. the tortious interference with employment rights.
New Jersey has very little, if any, interest in this litigation. The only reason plaintiff even has a contractual right which he can claim that the AAPGC allegedly interfered with is that federal labor law has provided him with one. New Jersey continues to recognize the doctrine of employment at will, holding that, with limited exceptions, an at will employee may be fired for a good reason, a bad reason, or no reason at all. See e.g., Erickson v. Marsh & McLennan Co., 117 N.J. 539, 560-561, 569 A.2d 793 (1990).
New Jersey, therefore, has no strong interest in this case. Fleming's rights, if any, exist because of "a labor contract  which has its being in, and draws its vitality from, the federal common law of labor contracts." Wilkes-Barre Pub. v. Newspaper Guild, etc., 647 F.2d 372, 381 (3d Cir.1981), cert. den. 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982).

C. Plaintiff's Claims Concerning the Arbitration Award Are Time-Barred and Fail to State a Claim.

The collective bargaining agreement between UPS and Local 177 contains express provisions for grievance and arbitration procedures regarding discharge from employment. Thus, Fleming's claims in connection with his discharge and the arbitration proceeding are governed by Section 301, and his sole and exclusive remedy for the protest of his discharge was the grievance and arbitration procedures of that collective bargaining agreement. E.g., Del Costello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Republic Steel v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Berda v. CBS Inc., 881 F.2d 20 (3rd. *131 Cir.1989), cert. den. 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); Cole v. Pathmark, 672 F. Supp. 796 (D.N.J. 1987).
Fleming's discharge claim was processed through the grievance and arbitration procedures of the Agreement. Fleming here attempts, in effect, to attack the arbitration decision itself. He contends that he was wrongfully discharged and that the Arbitration Panel's upholding of this discharge was also unlawful and that defendants interfered with his rights under the collective bargaining agreement or common law because the Arbitration Panel proceeded with his case. It has long been established, however, that a labor arbitration award is final and binding on an individual employee-grievant who has no standing to attack it. E.g., Hines v. Anchor Motor Freight, Inc., supra 424 U.S. at 563, 96 S.Ct. at 1055, citing Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Owens v. Texaco, 857 F.2d 262 (5th Cir.1988), cert. den., 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989); White v. Chemical Leaman Tank Lines, Inc., 490 F.2d 1267 (4th Cir.1974); Moore v. McLean Trucking Co., 473 F.2d 907 (4th Cir.1973); Gipson v. Supermarkets General Corp., 564 F. Supp. 50 (D.N.J. 1983). The award also collaterally estops plaintiff from maintaining his claims in the Second and Fifth Counts. E.g., Johnson v. Intern. Union Local No. 23, 828 F.2d 961, 963 (3d Cir.1987); Torre v. Falcon Jet Corp., 717 F. Supp. 1063, 1066 (D.N.J. 1989).
A plaintiff can maintain a Section 301 action to avoid an arbitration award only if he can prove both that his employer breached the collective bargaining agreement and that his union representative breached its duty of fair representation; failure to prove either element precludes a plaintiff's action. Del Costello, supra, 462 U.S. at 164-165, 103 S.Ct. at 2290-2291; citing United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 66-67, 101 S.Ct. 1559, 1565-1566, 67 L.Ed.2d 732; Findley v. Jones Motor Freight, etc, 639 F.2d 953, 958 (3d Cir.1981); Bellesfield v. RCA Communications, Inc., 675 F. Supp. 952 *132 (D.N.J. 1987). A plaintiff must establish the union's breach of duty before proceeding against his employer. Fajardo v. Foodtown Supermarkets, Inc., 702 F. Supp. 502, 508 (D.N.J. 1988), citing United Parcel Service, Inc. v. Mitchell, supra, 451 U.S. at 62-63, 101 S.Ct. at 1563-1564.
Any Section 301 breach of contract/breach of duty action is governed by a six-month statute of limitations. Del Costello, supra, 462 U.S. at 172, 103 S.Ct. at 2294. Thus Fleming's claims in the Second and Fifth Counts are time-barred. This action was filed on December 27, 1989. The Arbitration Panel rendered its decision upholding Fleming's discharge on September 13, 1988. Fleming recognizes that he received notice that his discharge was upheld shortly after that decision was rendered. He saw his attorney almost immediately after receiving notice that his discharge had been upheld, well before the appeal of his criminal case was heard on March 15, 1989. This action was not filed until long after the six-month statute of limitations had run. Thus, the claim which Fleming would have to make and prove in this case to be successful in his attack upon the arbitration award, i.e., that Local 177 breached its duty of fair representation (which he does not allege) and that UPS breached the collective bargaining agreement, would in any event be time barred. Bonds v. Coca-Cola Co., 806 F.2d 1324, 1326-27 (7th Cir.1986); see also, Lewis v. Intern. Broth. of Teamsters, Local 177, 826 F.2d 1310, 1317 (3rd Cir.1987).
Even if Fleming had filed this lawsuit timely, his Second and Fifth Count claims would nevertheless be barred for failure to state a claim upon which relief could be granted. Fleming does not even allege, let alone establish, that Local 177 breached its duty of fair representation to him. He cannot show the arbitrary, discriminatory or bad faith action required to make out a case. Hines v. Anchor Motor Freight, supra; Del Costello v. Teamsters, supra; Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).
*133 Local 177 took his discharge grievance to arbitration and succeeded in delaying the arbitration hearing, at his request, for nearly two and one-half years until the trial court rendered its decision. Local 177 advised Fleming periodically of its many attempts to delay the arbitration hearing at his request and eventually of the likelihood that it could not gain further delays.
Plaintiff was well aware of his right to prepare his defense with Local 177 and to be present before the Arbitration Panel, but admits that he chose not to avail himself of this opportunity. Fleming, voluntarily and with full knowledge of his rights, decided to forego testifying at his discharge arbitration hearing. Therefore, he cannot now be heard to complain that he was denied his right to appear at the discharge hearing.
Furthermore, there is no requirement that an arbitrator postpone a hearing pending resolution of criminal charges filed against a grievant. It has long been established that in labor arbitration proceedings governed by Section 301, questions of procedure (as well as evidence) are within the province of the arbitrator and not the courts. In John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the United States Supreme Court made clear that issues of procedure relating to substantive matters which are subject to arbitration are not for the courts, but for the arbitrator to decide.
Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, `procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.
* * * * * * * *
Although a party may resist arbitration once a grievance has arisen, as does Wiley here, we think it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance into play. Id. at 557-559, 84 S.Ct. at 918-919.
Fleming was candid about his desires for seeking delay of his arbitration case. He wanted to go to the Arbitration *134 Panel with an acquittal of all criminal charges, and then, when that failed, to go to the Arbitration Panel with a reversal of his conviction (which he eventually obtained, but only on the ground of denial of speedy trial). Although he was not entitled to a delay, he succeeded in obtaining one for two and one half years through the intercession of Local 177 and the refusal of the union Arbitration Panel members to hear his case. Moreover, it was not until July of 1988, after plaintiff's criminal trial had concluded and Judge Conte had rendered his opinion, that the Arbitration Panel decided to proceed with Fleming's grievance and scheduled the case for September, 1988. Despite Fleming's assertions to the contrary, the Arbitration Panel could not have been bound by an acquittal in the criminal proceedings. See Koenig v. Dept. of Taxation and Finance, N.Y.L.J., p. 8, col. 2 (N.Y. Sup. Ct. June 28, 1976), aff'd., 56 A.D.2d 773, 392 N.Y.S.2d 376 (N.Y. App. Div. 1977) (affirming trial court's denial of motion to vacate arbitration award which upheld grievant's discharge where, due to the divergent standards of proof involved, an arbitrator refused to give grievant's acquittal on criminal charge the preclusive effect of collateral estoppel).
Therefore, Fleming's claims in the Second and Fifth Counts are barred against UPS, Fox and O'Keefe, who are entitled to summary judgment on the claims asserted against them.

II.

CLAIMS AGAINST AAPGC AND ITS PANEL MEMBERS.

A. The Law of the State of New Jersey Is Preempted by § 301 of the Labor Management Relations Act of 1947; Federal Common Law Is Controlling.

A reading of the complaint demonstrates that Fleming's claims against the AAPGC and its panel members are based on alleged violations of the contract between Local 177 and UPS. Count Two, paragraph 2 alleges that the AAPGC "is *135 a committee set up as a result of a contract between plaintiff's union, IBT Local 177, and defendant United Parcel Service, Inc., to hear grievances and discharge matters filed on behalf of members of UPS." In paragraph 15, Fleming alleges that his "discharge, as upheld by the Grievance Committee, was arbitrary, illegal, contrary to public policy and constituted a denial of plaintiff's rights under the provisions of the ... [collective bargaining agreement]". Count Five, paragraphs 2 and 3, allege interference with Fleming's "employment contractual rights."
The claims which plaintiff alleges against the AAPGC and its panel members emanate from the collective bargaining agreement and require its interpretation. Hence, they purport to state a federal cause of action under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, which states:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
See, Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).
Further evidence that Fleming is alleging a federal claim for violation of a labor agreement is that the "public policy" violated by his discharge, as sustained by the Committee, arises from the terms of the collective bargaining agreement itself, specifically the grievance and arbitration provisions calling for a hearing when a grievance is filed by the Union. Also, Fleming contends that Articles 44 (Grievance and Arbitration), 45 (Seniority) and 56 (Retirement Plan) of the Union contract were violated by the Committee when it proceeded to hear his discharge case prior to the Superior Court's determination of his appeal. Clearly, all the allegations in the complaint against *136 the AAPGC and its members are substantially dependent upon the interpretation of the collective bargaining agreement.
Although state courts have concurrent jurisdiction over § 301 suits, federal common law must be applied by them in actions alleging violations of labor agreements. Textile Workers v. Lincoln Mills, supra. See also, Teamsters v. Lucas Flour Co., supra. "When resolution of a state law claim is substantially dependent upon the interpretation of a collective bargaining agreement, that claim must either be treated as a Section 301 claim or dismissed as preempted by federal labor contract law." Winick v. United Engineering Co., 757 F. Supp. 1035 (E.D.Mo. 1991), citing Allis-Chalmers, 471 U.S. at 220, 105 S.Ct. at 1915. Therefore, the sufficiency of Fleming's civil complaint must be determined by federal law.
Fleming's argument that his tortiuous interference claim is not preempted by § 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, is based entirely on the analysis by the Eleventh Circuit Court of Appeals in Hechler v. Intern. Broth. of Elec. Workers, AFL-CIO, 772 F.2d 788 (11th Cir.1985). The United States Supreme Court, however, vacated and remanded that case, holding:
Thus, in this case, as in Allis-Chalmers, it is clear that `questions of contract interpretation . .. underlie any finding of tort liability'. 471 U.S. at 218, 105 S.Ct. at 1915. The need for federal uniformity in the interpretation of contract terms therefore mandates that here, as in Allis-Chalmers, respondent is precluded from evading the pre-emptive force of § 301 by casting her claim as a state-law tort action. (footnote omitted).
Intern. Broth. of Elec. Workers, AFL-CIO v. Hechler, 481 U.S. 851, 862, 107 S.Ct. 2161, 2168, 95 L.Ed.2d 791 (1987).
"[A] tort claim `inextricably intertwined with consideration of the terms of the labor contract' is preempted under § 301 ..." Hechler, 481 U.S. at 858, 107 S.Ct. at 2166, (quoting Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912). The issue in the instant case is identical. This court must determine if plaintiff's "claim is sufficiently independent of the collective bargaining agreement to withstand the preemptive force of § 301 *137 ..." Despite Fleming's assertion to the contrary, his tortious interference claim cannot be adjudicated without consideration of the labor contract. See also, Johnson v. Anheuser Busch, Inc., 876 F.2d 620, 624 (8th Cir.1989).
Under the common law of tortious interference with contractual rights, "[i]t has always been agreed that a defendant might intentionally interfere with the plaintiff's interests without liability if there were good grounds for the interference ..." Prosser & Keeton on Torts, § 129, at 983 (5th Ed. 1984). New Jersey case law is consistent with this view.
To succeed on a claim of malicious interference with a business or contractual right, plaintiff must show: (1) actual interference by the defendant; and (2) the malicious nature of the interference. Raymond v. Cregar, 38 N.J. 472, 479-80, 185 A.2d 856 (1962). The interference alleged must be both intentional and legally or ethically improper. Raul International Corp. v. Sealed Power Corp. 586 F. Supp. 349, 358 (D.N.J. 1984).
`Malice', as used in a tort claim of malicious interference, constitutes the intentional doing of a wrongful act without justification or excuse. Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 563, 117 A.2d 889 (1955) ... [citations omitted].
Labus v. Navistar Inter. Transp. Corp., 740 F. Supp. 1053, 1063-1064 (D.N.J. 1990).
In the instant case, the contractual right asserted by plaintiff  i.e., the right to continue his employment absent "proven dishonesty" is determinable only by reference to the collective bargaining agreement. Plaintiff claims that the term "proven dishonesty" in Article 44, § 1 of the collective bargaining agreement means after a final judgment of conviction in a criminal proceeding. That interpretation was not accepted by either the Committee or the parties. See generally, Dansberry v. Ryder Truck Lines, 109 L.R.R.M. 3324, 3326, 1982 WL 2023 (W.D.Ten. 1982) (joint committee properly upheld driver's discharge by employer for DWI and reckless driving despite later reversal of DWI conviction by higher court).
Fleming's contention that "proven dishonesty" means beyond a reasonable doubt in an arbitration (or civil) proceeding is baseless.
*138 To allow a jury to decide what the parties intended by the words "proven dishonesty" in deciding whether Fleming's contractual right was interfered with would defeat altogether "the interests supporting the uniform interpretation of collective bargaining agreements under federal common law ..." Hechler, 481 U.S. at 857, 107 S.Ct. at 2165.
Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.
Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911. These considerations become even more compelling where, as here, the collective bargaining agreement at issue governs employment relationships in many states.
Besides, defendant Committee and its members were not, as Fleming's tortious interference theory assumes, meddling in plaintiff's employment relationship with UPS. Its jurisdiction was invoked on plaintiff's behalf after his employment had already been terminated. The Committee is a creature of the collective bargaining agreement; its authority is determinable by reference to that agreement (United Steelwkrs. of Amer. v. Enterprise W. & C. Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)) and to the Committee's procedural rules which were adopted and approved by the parties. See also John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 547, 84 S.Ct. at 913.
Both the bargaining agreement and the procedural rules necessarily must be considered in deciding whether the Committee defendants' actions were "malicious," that is, wrongful and "without justification or excuse." Labus, supra, 740 F. Supp. at 1063. It is impossible to consider whether there were good grounds for the Committee's decision without considering the sources of its authority. The idea that this tortious interference claim can be adjudicated without considering either the *139 collective bargaining agreement or the Committee's award is fallacious.
Here, as in labor arbitration cases generally, "`procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator ..." John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 547, 84 S.Ct. at 913. Procedural rulings are accorded the same deferential standard of review as the merits of the arbitrator's award. Absent bad faith or gross procedural unfairness, the arbitrator's judgment should be upheld. United Paperworkers Intern. Union v. Misco, Inc., 484 U.S. 29, 40, 108 S.Ct. 364, 372, 98 L.Ed.2d 286 (1987). These issues are resolvable exclusively under federal law. Fleming cannot be permitted to evade the requirements of § 301 by relabeling his grievance dispute as a claim for tortious interference under state law. Count Five of the complaint is preempted.
If statements are privileged, the court will not permit the circumvention of the privilege by affording an almost equally unrestricted action under a different label. Rainer's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 564, 117 A.2d 889 (1955). Kanengiser v. Kanengiser, 248 N.J. Super. 318, 337-338, 590 A.2d 1223 (Law Div. 1991).

B. Plaintiff Has No Standing to Obtain Review of the Committee's Decision by this Court.

Under federal common law only a party to the collective bargaining agreement  UPS or Local 177  (absent a breach of the duty of fair representation claim) has standing to obtain review the AAPGC's decision. Adams v. Crompton & Knowles Corp., 587 F. Supp. 561, 562-63 (D.N.J. 1982), aff'd without opinion, 722 F.2d 730 (3d Cir.1983). It is apparent from the face of the complaint that this action seeks to review the AAPGC's decision. Not only does it imply that the AAPGC's decision should be set aside, so far as paragraph 17 of Count Two requests an equitable decree from this Court, but the *140 substantive allegations of the complaint allege that the AAPGC's decision exceeded its authority under the collective bargaining agreement and seeks to review and set aside AAPGC's decision.
Absent a claim that Local 177 violated its duty of fair representation (and none is made here), the decision of the AAPGC is final and binding (AAPGC Rules of Procedure, Art. IV, § 5). United Parcel Service v. Mitchell, supra, 451 U.S. at 61, 101 S.Ct. at 1563; Hines v. Anchor Motor Freight, Inc., supra, 424 U.S. at 576, 96 S.Ct. at 1062. The rule controlling this case was stated in McNair v. United States Postal Service, 768 F.2d 730 (5th Cir.1985):
When a collective bargaining agreement establishes a mandatory, binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of the aggrieved employees, the results obtained by the union are normally conclusive of employees' rights under the agreement ... This means, of course, that an aggrieved worker whose employment is governed by such an agreement normally lacks standing independently to initiate grievance procedures, to sue for breach of the collective bargaining agreement, or to attack in court the results of the grievance process ... [citations and footnotes omitted.] Id. at 735.
The general proposition that employees lack standing to challenge arbitration awards is followed in this Circuit, Adams, supra, 587 F. Supp. at 562, and has been approved uniformly by other jurisdictions. E.g., Early v. Eastern Transfer, 699 F.2d 552, 555 n. 3 (1st Cir.1983), cert. den. 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1984); Samples v. Ryder Truck Lines, Inc., 755 F.2d 881 (11th Cir.1985); Acuff v. United Papermakers and Paperworkers, 404 F.2d 169 (5th Cir.1968), cert. den. 394 U.S. 987, 89 S.Ct. 1466, 22 L.Ed.2d 762 (1969).
An individualized right of action in court, "no less than the action of invoking arbitration itself, would certainly disrupt the administration of the collective bargaining agreement and `would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.' ..." Samples, supra, 755 F.2d at 886 (quoting Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. *141 614, 616, 13 L.Ed.2d 580 (1965)) (action to enforce arbitral award by individual).
Here, the grievance and arbitration provisions of the parties' collective bargaining agreement, together with the AAPGC Rules of Procedure, establish a mandatory, binding procedure for the final resolution of discharge cases. The Union is afforded the exclusive right to challenge disciplinary action under the Agreement. Local 177 pursued its protest of Fleming's discharge through that procedure until an adverse decision was rendered by the AAPGC. That decision is final and binding; Fleming is without standing to challenge it.
Fleming maintains that the "effect that the reversal of plaintiff's conviction ... would have had on plaintiff's grievance hearing" constitutes a material issue of fact for trial. It is unnecessary for the court to reach this issue because Count Two is preempted and cannot be asserted under federal law. Further, inquiry into an arbitrator's mental processes is impermissible. Reichman v. Creative Real Estate Consultants, Inc., 476 F. Supp. 1276, 1286 (S.D.N.Y. 1979); accord, Local P-9, UFCW v. George A. Hormel & Co., 776 F.2d 1393, 1395 (8th Cir.1985); Wood v. General Teamsters Union Local, 406, 583 F. Supp. 1471, 1472-73 (W.D.Mich. 1984); Brownko Intern. Inc. v. Ogden Steel Co., 585 F. Supp. 1432, 1435-36 (S.D.N.Y. 1983). How the Committee's members viewed Fleming's conviction, or would have viewed its subsequent reversal, is not susceptible to litigation.

C. The AAPGC and Its Members Are Immune from Suit Because The Committee Is an Arbitral Body.

The AAPGC panel that heard plaintiff's discharge case included three representatives of the Union and three representatives of the Company. It is well settled that a joint committee, such as the AAPGC and its members, fulfill the same decision-making responsibilities as arbitrators and are entitled to the same deference and treatment. General Drivers, *142 etc., Local U. no. 89 v. Riss & Co., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); Tongay v. Kroger Co., 860 F.2d 298, 300 (8th Cir.1988); Eastern Transfer, supra, 699 F.2d at 560; Teamsters Local U. no. 30 v. Helms Exp., Inc., 591 F.2d 211, 218 (3d Cir.1979); Morris v. Werner-Continental, Inc., 466 F.2d 1185, 1190 (6th Cir.1972). Their decisions are reviewed under the same standards as arbitration awards. Teamsters Local 30, supra, 591 F.2d at 216, 218.
Fleming's assertion that the committee "defendants cannot be reasonably found to be arbitrators ..." not only is contrary to uniform legal authority, but the critical facts on which it relies misstate the record. Contrary to Fleming's argument, the Union members of the Committee are not employed by UPS. They are fulltime officers and business agents of local unions other than Local 177, signatory to the Atlantic Area Supplemental Agreement between the IBT and UPS. Moreover, the procedural ruling complained of by Fleming  denial of his request for further hearing continuances after his Municipal Court trial  was made by a neutral arbitrator over the Union members' objections.
Equally unavailing is Fleming's suggestion that the Committee defendants exceeded their authority, thereby forfeiting their immunity, by proceeding with his grievance hearing before the appeal from his conviction was decided by the Superior Court. In Tamari v. Conrad, 552 F.2d 778 (7th Cir.1977), where the authority of the arbitral panel was challenged, the court of appeals held "that the district court correctly dismissed the action because arbitrators are immune from suit with respect to questions involving their authority to resolve a dispute." Id. at 779. Arbitrators do not become liable in damages whenever their decisions are challenged.
Finally, the alleged harm to Fleming and his family was not caused in any way by the Committee defendants. Fleming, by his stubborn refusal to appear at this grievance hearing, together with his failure to cooperate with Local 177 in developing *143 his own defense, bears the responsibility for the denial of his grievance. The Committee functioned responsibly, within the scope of its authority under the collective bargaining agreement and its procedural rules.
For over a century, it has been recognized that "arbitrators are judges chosen by the parties to decide the matters submitted to them ..." Burchell v. Marsh, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96 (1855). Because their functions are quasi-judicial, arbitrators are accorded "immunity for acts arising out of the scope of their arbitral functions and within their jurisdiction in contractually agreed upon arbitration proceedings ..." Corey v. New York Stock Exchange, 691 F.2d 1205, 1209-10 (6th Cir.1982).
The doctrine of arbitral immunity is fully applicable to labor arbitrators. In Cahn v. International Ladies' Garment Union, 311 F.2d 113, 114-15 (3d Cir.1962), the Third Circuit Court of Appeals held that an arbitrator functioning in his arbitral capacity "was performing quasi-judicial duties and was `clothed with an immunity, analogous to judicial immunity, against actions brought by either of the parties arising out of his performance of his ... duties'" (citations omitted). Accord, I. & F. Corp. v. Intern. Ass'n of Heat & Frost, 493 F. Supp. 147, 150 (S.D.Ohio 1980); Hill v. Aro Corporation, 263 F. Supp. 324, on final hearing, 275 F. Supp. 482 (N.D.Ohio 1967).
Members of joint committees created to resolve grievance disputes under Teamster contracts with the freight industry also are "clothed with absolute arbitral immunity" for all acts, whether proper or improper, unless they act in clear absence of jurisdiction. Larry v. Penn Truck Aids, Inc., 94 F.R.D. 708 (1982), on final hearing, 567 F. Supp. 1410 (E.D.Pa. 1983). See also Yates v. Yellow Freight System, Inc., 501 F. Supp. 101, 105 (S.D.Ohio 1980).
Therefore, the AAPGC or its members are not subject to suit.

*144 D. No Evidence Supports Plaintiff's Claim that the AAGPG's Decision to Proceed with His Discharge Case before Final Disposition of his Criminal Appeal Was Unreasonable and Prejudicial to Plaintiff or Deprived Him of a Fair Hearing.

Fleming has presented no evidence that the members of the AAPGC acted improperly in upholding his discharge or failed to give him a fair hearing. His sole claim is that he was prejudiced by having his discharge case heard by the AAPGC before the appeal of his criminal case was determined by the Superior Court. He acknowledges, however, that he knows of no rule or regulation that the Committee violated by proceeding as it did.
This court's authority to review arbitral decisions is limited. As long as the decision draws its essence from the collective bargaining agreement, and bad-faith or gross procedural unfairness is avoided, the arbitrator's judgment should be upheld. United Steelwrkrs. of Amer. v. Enterprise W. & C. Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). See also, United Paperworkers Intern. Union v. Misco, Inc., 484 U.S. 29, 40, 108 S.Ct. 364, 372, 98 L.Ed.2d 286 (1987), relying on John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964) ("`procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator").
It was not unfair to Fleming to have his grievance case heard after his trial in the Municipal Court concluded, but before his appeal was determined. Since he voluntarily testified in the Municipal Court proceeding, his constitutional rights could not be affected by his having to testify later before the AAPGC. Besides, it was not the prospect of testifying before the Committee that troubled plaintiff. He just did not want to appear until he had an acquittal in his criminal case. No matter what the rules of the Committee provide, he maintained that their *145 "refusal to give a further postponement was nonetheless unreasonable".
Neither Fleming's conviction nor its reversal had any necessary bearing on the proceedings before the AAPGC. The AAPGC is entitled to disagree with the findings of the Municipal Court as they relate to the issue of Fleming's discharge. Under the AAPGC's procedures, evidence is presented by both the Company and the Union. Based on the presentation of the evidence, the AAPGC makes its determination whether to sustain the discharge or not, which Fleming understood. Different evidence can be presented by the parties, different inferences can be drawn and different credibility determinations can be made by different decision makers. Thus, it is immaterial whether Fleming's hearing by the Committee occurred before or after determination of his criminal appeal.
Fleming is unable to point to any rule or regulation in either the AAPGC's Rules of Procedure or the collective bargaining agreement that requires postponement of grievance hearings during the pendency of related criminal proceedings. He professed not to know that the AAPGC's Rules limit postponements to just two for any reason on any given case. The record shows that Fleming, with his Union's strong support, obtained monthly continuances that kept his grievance case in abeyance for more than two years until he had had his day in court. At that point the neutral arbitrator, presumably unconvinced that a de novo review on the existing record warranted further delay, broke the procedural deadlock and required the case to proceed.
The allegation that Fleming was prejudiced because he did not have the opportunity to appear before the Committee is not supported by the facts. He testified he knew that he had a right to appear before the AAPGC and to submit a written statement but he was repeatedly told by his attorney not to speak to his Union representatives and not to appear before the AAPGC. Numerous letters were sent by Local 177 requesting *146 Fleming to come to the union hall to prepare for the case and notifying him of the hearing dates.
In addition, there is no evidence to suggest that Fleming would not have received a fair trial if he had appeared. It was his understanding that the Committee would consider all the facts in the case based on the testimony and the record that was made before it. He also knew that defendant UPS officials would testify before the Committee, and he does not know the Committee members who decided his case. Thus, he could not contend that they were hostile to him or partial to the Company.
Fleming's tactical position  to delay appearing before the Committee until after appellate review of his criminal case in the hope of achieving a reversal  was not his right under the Rules of Procedure of the Committee or the collective bargaining agreement. No party is able to wait and postpone a grievance hearing simply to maximize his chances of success. Such a policy would defeat the central purpose of the grievance procedure, that is, the swift resolution of industrial disputes. DelCostello v. International Broth. of Teamsters, supra, 462 U.S. at 171, 103 S.Ct. at 2294. The Committee acted well within its wide discretion in declining further continuances after Flemings's trial in the Municipal Court ended. This is not one of those "very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct," Misco, Inc., supra, 484 U.S. at 40 n. 10, 108 S.Ct. at 372 n. 10, thus empowering the Court to set aside the award.

E. The Complaint Is Barred by the Applicable Six-Month Statute of Limitations.

This action against the AAPGC and its members essentially seeks to vacate the Committee's September 13, 1988 decision upholding plaintiff's discharge. This being so, the claims asserted by plaintiff are normally "intertwined with the day-to-day relationship between management and labor." *147 Brenner v. Local 514, United Broth. of Carpenters, 927 F.2d 1283, 1294 (3d Cir.1991), (quoting Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123, 132-33 (3d Cir.1987), cert. den., 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988)). Under the federal common law applicable to § 301 suits in this jurisdiction, a six-month limitations period is applicable. Taylor v. Ford Motor Co., 761 F.2d 931 (3d Cir.1985), cert. den., 474 U.S. 1081, 106 S.Ct. 849, 88 L.Ed.2d 890 (1986).
The appropriate statute of limitations is § 10(b) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(b), which the Supreme Court held applicable to § 301 employee suits to vacate arbitration awards in DelCostello v. International Broth. of Teamsters, supra, 462 U.S. at 151, 103 S.Ct. at 2283; Taylor II, supra, 761 F.2d 931. This development liberalized preexisting law because a ninety-day limitation formerly applied to actions to vacate arbitration awards under New Jersey law. See, Taylor v. Ford Motor Co. (Taylor I), 703 F.2d 738 (3d Cir.1983). This action against the AAPGC and its members is time-barred. More than fifteen months elapsed between the Committee's final decision and the date this suit was filed.
Summary judgment in favor of the AAPGC and its members is granted to dismiss Counts Two and Five.

III.

THE FOURTH COUNT OF THE COMPLAINT WHICH ALLEGES THAT UPS MADE ILLEGAL PAYMENTS TO KERN IS DISMISSED BECAUSE THE PAYMENTS WERE PERMISSIBLE.
In the Fourth Count of his complaint Fleming alleges that:
2. Defendant Kern, in violation of the laws of the State of New Jersey, knowingly agreed to accept and actually accepted money payment, not allowed by law, from defendant United Parcel Service for the performance of his official *148 duties as Saddle Brook Municipal Prosecutor in the prosecution of plaintiff before the Saddle Brook Municipal Court.
3. Defendant United Parcel Service in violation of the laws of the State of New Jersey paid money, not allowed by law, to defendant Kern for the performance of his official duties as Saddle Brook Municipal Prosecutor in the prosecution of plaintiff before the Saddle Brook Municipal Court.
Fleming asserts that he has been damaged as a result of these payments and seeks relief against both UPS and Kern. Fleming claims that these alleged violations of the laws of New Jersey are "[b]ribery, corrupt influence and misconduct in office and conspiracies regarding said violations. (N.J.S.A.) 2C:27-1 through 2C:27-7; 2C:30-2 and the common law of the State of New Jersey concerning same."
UPS acknowledges that it agreed to and did make payments to Kern for his time spent in preparation for and trial on nonregularly scheduled trial days in the Saddle Brook Municipal Court. UPS has two statements from Kern for professional services rendered along with UPS documentation authorizing payment for these services. These two statements reflect billings for court appearances on December 4 and 5, 1986 and July 14, 17 and August 6, 1987 with related work.
On March 1, 1984, two years before criminal charges were filed against Fleming, the New Jersey Supreme Court Committee on Attorney Ethics issued Opinion 523 which deals squarely with the propriety of payments by a private party to a municipal prosecutor for prosecution of criminal complaints filed by the private party in the prosecutor's municipal court. The Committee opinion states:
The question posed in this inquiry deals with the Municipal Prosecutor as the attorney for a private client seeking to prosecute a matter in the Municipal Court on behalf of that client rather than directly on behalf of the State or Municipality. In both cases, however, the attorney appears on behalf of the people of the State. Rule 7:4-4(b) provides that where no one else appears on behalf of the State or Municipality, any attorney may appear on behalf of the complaining witness. Accordingly, we see no impropriety in the Municipal Prosecutor's prosecuting a matter in his Municipal Court on behalf of a private client and being paid by that client.
*149 Fleming contends that Opinion 523 only applies if the private party wishes to employ a municipal prosecutor on a regular basis. Common sense dictates that if it is ethical to pay such an attorney to prosecute many cases, it is certainly permissible to pay him to prosecute one case. Opinion 523 of the Advisory Committee on Professional Ethics, New Jersey Law Journal, pp. 1, 8 (March 1, 1984), 113 N.J.L.J. Index page 225; see also Professional Responsibility in New Jersey, at 615 (N.J. Institute of Continuing Legal Education 1990).
Judge Conte was made aware of the payments to Kern before he rendered his decision regarding Fleming. Therefore, Fleming's conviction was not, in any way, obtained through corrupt means.
Ethics Opinion 523 makes clear that the payments made by UPS to Kern in connection with the prosecution of the criminal complaints against Fleming were proper. Fleming's attorney acknowledged at oral argument that if these payments were improper, so were the ones to the succeeding prosecutor, an associate with Pitney, Hardin, Kipp and Szuch. Accordingly, Fleming's allegations in the Fourth Count of his Complaint fail to state a claim upon which relief can be granted. Therefore, UPS and Kern are entitled to summary judgment on the Fourth Count.

IV.

THE SIXTH COUNT OF PLAINTIFF'S COMPLAINT ALLEGING MALICIOUS PROSECUTION IS DISMISSED AS A MATTER OF LAW BECAUSE PLAINTIFF CANNOT ESTABLISH THE REQUISITE ELEMENTS TO MAINTAIN THE CLAIM.
Fleming alleges that defendants UPS, Fox, O'Keefe, Castellanos, Rogalsky and Kern brought criminal actions against him "maliciously and without probable cause." Fleming cannot establish the requisite elements of a claim for malicious prosecution.
*150 Malicious prosecution is an action which is disfavored in the law because "citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime." Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975). The elements of a malicious prosecution claim arising from a criminal prosecution necessary to establish a prima facie case are:
(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause of the proceeding, and (4) that it was terminated favorably to the plaintiff. Id. at 262, 337 A.2d 365.
The burden is upon a plaintiff to establish each element and "[u]pon failure to prove any one, the cause must fail." Ibid.

A. Plaintiff Cannot Establish a Favorable Termination of the Theft Charge.

With regard to his arrest on the charge of theft, Fleming cannot establish the existence of a favorable termination. Favorable termination of the prior prosecution is "elemental to the cause of action." Rubin v. Nowack, 248 N.J. Super. 80, 82, 590 A.2d 249 (App.Div. 1991). The inquiry as to whether a criminal proceeding has been terminated favorably to a plaintiff must focus "on whether the termination was or was not dispositive as to the accused's innocence of the crime for which he was charged." (Emphasis added). Id. at 83, 590 A.2d 249.
Fleming's conviction was overturned on a technical matter of law, the violation of his right to a speedy trial. That determination was not dispositive of Fleming's innocence on the charge of theft. His claim, insofar as it is based on the theft charge, therefore, fails.

B. Plaintiff Cannot Establish the Absence of Probable Cause for the Theft Charge.

Fleming cannot establish the requisite absence of probable cause when the theft charge was filed.
In order to meet this burden of proof, a "plaintiff must establish a negative, namely, that probable cause did not exist." *151 Lind, supra, 67 N.J. at 263, 337 A.2d 365. A plaintiff must demonstrate that "at the time when the defendant put the proceedings in motion, the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed." Id. at 263, 337 A.2d 365.
Fleming's conviction of theft in Municipal Court on that charge raises a rebuttable presumption of the existence of probable cause to prosecute. This remains so, despite the fact it was overturned on appeal. Id. at 264, 337 A.2d 365.
In determining the effect of a municipal court conviction, later overturned on appeal, in the context of a malicious prosecution claim, the Lind court concluded that an examination of the lower court proceedings must be made.
[I]t may well be in a given case that a municipal magistrate's conclusions of guilt could reasonably have been reached. In that event, his findings should preclude the plaintiff's suit and the presumption of probable cause raised by the conviction, although reversed on appeal, would not have been rebutted. On the other hand, where the municipal magistrate erred as a matter of law, including a factual determination unsupported by substantial evidence, so that the conviction could not stand, or his factual findings negated probable cause, or the conviction was obtained by fraud, perjury or other corrupt means, the conviction should be disregarded. Id. at 265-266, 337 A.2d 365.
The Court must first determine whether what occurred before the municipal court judge precludes a plaintiff's malicious prosecution suit.
Analysis of what occurred before the magistrate and the effect thereof are questions for the court. It must resolve whether the magistrate's determination was based on evidence from which a reasonable inference of probable cause might be drawn. If not, it is to be disregarded. If it was, then the malicious prosecution suit should be dismissed. To re-try the issue of probable cause is unnecessary. Id. at 266, 337 A.2d 365.
During the course of Fleming's criminal trial, all three UPS loss prevention employees identified Fleming as the man they had observed remove the UPS packages which had been under surveillance. All three men also testified that Fleming was the driver of the UPS vehicle which had sped away with Fox literally hanging from the vehicle and which nearly ran over both Castellanos and O'Keefe after the three men had attempted *152 to confront Fleming about the theft of the packages. Fleming testified that he was not in Saddle Brook at the time that the theft and assaults took place, so that he could not have committed the offenses which occurred there, but there was also substantial contradictory evidence, including the testimony of a tachograph expert, which placed Fleming in Saddle Brook at the time the offenses occurred. Fleming did not sustain his credibility in the Municipal Court on this issue.
As the Appellate Division recently noted in Carollo v. Supermarkets General, 251 N.J. Super. 264, 597 A.2d 1105 (App.Div. 1991):
The reasonable belief which constitutes probable cause does not require the merchant's employee to evaluate the totality of circumstances, both inculpatory and exculpatory, as a trier of fact guided by a reasonable doubt standard. Id. at 271, 597 A.2d 1105.
Judge Conte found Fleming's testimony to the effect that he was not present at the scene of the alleged assault not to have been credible and he credited the testimony of the UPS loss prevention specialists. He found that Fleming was present, committed the theft and, in fact, sped away from the scene despite the close proximity of the defendants.
Judge Conte's findings were reasonable, considered objectively. As Fleming observes, probable cause in terms of a defense to malicious prosecution "has been defined as a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinarily prudent man in believing the party is guilty of the offense." In light of Judge Conte's findings, any reasonable person would have had probable cause to initiate criminal proceedings for theft against Fleming.
Judge Conte's findings bar any claim arising out of the theft charge. Therefore, Fleming cannot establish an absence of probable cause.

C. Plaintiff Cannot Establish the Requisite Absence of Probable Cause for the Assault Charges.

Judge Conte's opinion also bars Fleming's claim on the assault charges. Fleming's acquittal on these charges does not *153 establish a lack of probable cause. Even his favorable termination on the assault charges "sheds no light on the existence of probable cause at a time of the initial complaint. Notwithstanding a favorable termination of the criminal proceeding, the burden remains on plaintiff to demonstrate by independent proof that the criminal complaint was filed without probable cause." Rubin v. Nowack, supra, 248 N.J. Super. at 85, 590 A.2d 249; citing Shoemaker v. Shoemaker, 11 N.J. Super. 471, 476, 78 A.2d 605 (App.Div. 1951) (magistrate's dismissal of an action is insufficient to sustain plaintiff's burden of proving lack of probable cause).
Furthermore, "... a complete disclosure of the dismissal proceeding is required in order to determine whether, as a matter of law or fact, probable cause existed for [defendants'] institution of the proceedings resulting in the indictment." Williams v. Page, 160 N.J. Super. 354, 365, 389 A.2d 1012 (App.Div.), certif. den., 78 N.J. 395, 396 A.2d 582 (1978).
Although Williams addressed the issue of whether a lack of prosecution or dismissal by reason of insanity constituted a favorable termination, it is also instructive on the issue of probable cause and the role of mens rea in a criminal proceeding which is later the basis of a malicious prosecution suit.
The Williams court found that, "[i]f the acts alleged in the indictment had in fact occurred but were legally excused ... [defendants] could not reasonably be said to have been aware of [plaintiff's mental state] ... when [they] filed the charges." Id. at 366, 389 A.2d 1012. Judge Conte found that Fleming committed the acts complained of but that there was doubt, "although slight" of criminal intent. Therefore, Fleming cannot prove a lack of probable cause because the defendants' actions were not unreasonable under the circumstances.
UPS and its employees, like the defendant in Williams, could not reasonably have been expected to have known Fleming's mental state at the time of his actions. In other words:

*154 An ordinary cautious man might well have believed that Williams was guilty of the offenses charged in the indictment. The proofs do not sustain a finding that the criminal acts charged in the indictment were not committed by Williams. At best, Williams' claim is that although he committed the acts charged, he was insane at the time and could not be found guilty of the necessary criminal intent to justify conviction of a crime. [Id. at 367, 389 A.2d 1012 (emphasis added).]
In the instant case, as in Williams, the only reason for the favorable determination was the lack of the requisite criminal intent. Fleming was found to have committed the acts which constituted the assaults, but was acquitted only due to "some doubt, although slight" that he had the requisite criminal intent, "to commit an assault on anyone rather than to flee the scene as quickly as possible." As in Williams, defendants Fox, O'Keefe and Castellanos here could not have been expected to determine whether Fleming's actions which they observed and to which they testified and which were found to have occurred were coupled with the requisite criminal intent. Judge Conte's opinion and the record before him establish probable cause. Fleming cannot establish a lack of probable cause for these defendants' filing of the assault charges. Therefore, his claim for malicious prosecution in the Sixth Count is dismissed.

V.

THE EIGHTH COUNT OF PLAINTIFF'S COMPLAINT ALLEGING FALSE ARREST IS DISMISSED BECAUSE IT IS TIME-BARRED AND BECAUSE PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE.
Fleming, in the Eighth Count of his complaint, alleges that on March 3, 1986 defendants Fox, O'Keefe, Castellanos and Rogalsky directed certain Saddle Brook police officers to unlawfully arrest and detain him. Fleming cannot maintain his claim for false arrest or false imprisonment because it is untimely and he cannot demonstrate the requisite elements of his claim.
Unlike malicious prosecution, an action for false imprisonment or false arrest accrues at the time of unlawful *155 detention. Bauer v. Borough of Cliffside Park, 225 N.J. Super. 38, 47, 541 A.2d 719 (App.Div. 1988), certif. den., 113 N.J. 330, 550 A.2d 447 (1988). A claim for false arrest must be brought within two years of the unlawful detention. Earl v. Winne, 14 N.J. 119, 132, 101 A.2d 535 (1953); N.J.S.A. 2A:14-2. Fleming was arrested on March 3, 1986 but did not file suit until December 27, 1989.
False arrest or false imprisonment is the constraint of the person without legal justification. Pine v. Okzewski, 112 N.J.L. 429, 170 A. 825 (E. & A. 1934). There are two elements to the tort: (1) an arrest or detention of the person against his will; (2) done without proper legal authority or "legal justification." Barletta v. Golden Nugget Hotel Casino, 580 F. Supp. 614, 617 (D.N.J. 1984). Thus, as in cases of malicious prosecution, the existence of probable cause is a defense provided it serves to validate the arrest. Bauer, supra, 225 N.J. Super. at 47, 541 A.2d 719. Judge Conte's opinion confirms that probable cause existed to have Fleming arrested on both the theft and assault charges.[4]
Fleming argues that the statute of limitations should be tolled during the pendency of his criminal case, citing Nix v. Spector Freight Systems, Inc. 62 N.J. Super. 213, 162 A.2d 590 (App.Div. 1960), for the proposition that for the pendency of another proceeding to toll the statute on an action the other proceeding must prevent enforcement of the remedy by action. Not only would pendency of the criminal case against Fleming *156 not bar a remedy in a false arrest action, it would in no way prevent him from filing and pursuing the false arrest claim. First, an action for false arrest, unlike an action for malicious prosecution, is not dependent on a favorable termination of a criminal proceeding. It is, rather, dependent on an absence of probable cause. Second, resolution of the criminal action, even by acquittal, would not provide proof of a lack of probable cause in a false arrest action. Finally, it has been held that the pendency of criminal proceedings does not toll the statute of limitations on a false arrest claim. Pisano v. City of Union City, 198 N.J. Super. 588, 591-93, 487 A.2d 1296 (Law Div. 1984) (specifically rejecting a claim that pending criminal proceedings somehow tolled the statute of limitations for a false arrest claim).
Defendants UPS, Fox and O'Keefe are entitled to summary judgment on the Eighth Count of the complaint.

VI.

THE FIRST COUNT OF PLAINTIFF'S COMPLAINT ALLEGING DENIAL OF SPEEDY TRIAL MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.
Plaintiff in the First Count of his complaint has alleged a claim based on the violation of his right to a speedy trial under both the United States and New Jersey constitutions. Fleming has no basis to sue under either constitution. There is no authority which would support Fleming's right to maintain an action based upon an implied claim under the Sixth Amendment. Furthermore, the New Jersey courts have yet to recognize any civil action based on the alleged denial of the right to a speedy trial under the N.J. Constitution, Art. I, Par. 10.
In the face of defendants' argument that Fleming cannot maintain such a claim, he responded that his claim "is sounded in fraud." Not only is the First Count of the complaint devoid *157 of any allegations of fraud, but it fails to comply with R. 4:5-8 which requires a plaintiff to plead fraud with particularity. See also Rego Industries, Inc. v. American Mod. Metals Corp., 91 N.J. Super. 447, 456, 221 A.2d 35 (App.Div. 1966). Fleming's belated assertion that his claim "is sounded in fraud" is not accurate.
His claim regarding failure to obtain a speedy trial has no basis in any event because he waited for more than two years to seek a speedy trial, i.e. until April, 1988, and his trial concluded on April 25, 1988. If he had wanted a speedy trial earlier, he could have so moved.
Fleming's First Count contention that defendants deprived him of a speedy trial, could only, among the various counts of his complaint, be treated under his Seventh Count claim for abuse of process. The First Count of his complaint is dismissed.

VII.

THE SEVENTH COUNT OF PLAINTIFF'S COMPLAINT ALLEGING ABUSE OF PROCESS IS DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH THE REQUISITE ELEMENTS OF HIS CLAIM.
Fleming, in the Seventh Count of his complaint, has alleged that defendants UPS, Castellanos, O'Keefe, Fox, Rogalsky and Kern "pervertedly used [legal] process to accomplish a result outside of its lawful scope," to wit: "as a punishment" for his refusal to resign. Fleming cannot establish the requisite elements of his abuse of process claim. The elements of an abuse of process claim are: "(1) an ulterior motive and (2) some further act after an issuance of process representing the perversion of the legitimate use of the process." SBK Catalogue Partnership v. Orion Pictures, 723 F. Supp. 1053, 1067 (D.N.J. 1989); citing Fielder Agency v. Eldan Constr. Corp., 152 N.J. Super. 344, 348, 377 A.2d 1220 (Law Div. 1977).

*158 A. The Offer of Resignation Does Not Provide a Basis for Plaintiff's Claim.

Fleming alleges in his complaint that this "ulterior motive" has been established because UPS personnel first offered him the opportunity to resign prior to bringing the criminal charges and that therefore the criminal matter was only instituted in order to force his resignation. Even if these allegations were true, Fleming's claim must fail.
Unlike the view expressed in the Restatement and Prosser, which would permit liability without regard to whether the improper coercive act occurred before, after or coincident with the institution of the legitimate process itself, New Jersey law requires a further coercive act after the process issues in order to prove an improper use of legal procedure.
Simone v. Golden Nugget Hotel and Casino, 844 F.2d 1031, 1038 (3rd Cir.1988); citing Fielder Agency, supra, 152 N.J. Super. at 348, 377 A.2d 1220.
New Jersey case law is replete with examples of the judiciary's requirement that in order for the tort of abuse of process to lie "the litigator [must] perform some act subsequent to the issuance of process which represents the perversion or abuse of the legitimate purposes of that process." SBK Catalogue, supra, 723 F. Supp. at 1067; citing Tedards v. Auty, 232 N.J. Super. 541, 549, 557 A.2d 1030 (App.Div. 1989); Penwag Property Co., Inc. v. Landau, 148 N.J. Super. 493, 499, 372 A.2d 1162 (App.Div. 1977); Gambocz v. Apel, 102 N.J. Super. 123, 130-131, 245 A.2d 507 (App.Div. 1968), certif. den., 52 N.J. 485, 246 A.2d 447 (1968).
In view of this requirement, "abuse of process will not lie against a party unless that party has demonstrably used process after its issuance solely to coerce or injure his adversary." SBK Catalogue, supra, 723 F. Supp. at 1067-1068. (Emphasis added.) Bad motives or malicious intent leading to the institution of the suit are insufficient to support this cause of action. Ibid., citing Fielder Agency, supra, 152 N.J. Super. at 348, 377 A.2d 1220; Gambocz v. Apel, supra, 102 N.J. Super. at 132, 245 A.2d 507 (in the absence of conduct that can be *159 considered an abuse of process, evidence of defendant's private interest in seeing plaintiff subjected to legal process does not suffice to show abuse).
Moreover, "proof of the ulterior motive may be inferred from the improper act [subsequent to issuance], but if the act be a proper one, the motive is immaterial". Ash v. Cohn, 119 N.J.L. 54, 58, 194 A. 174 (Sup.Ct. 1937). Since the "gist of the action is the unlawful use of lawful process after its issuance," Fleming must show some unlawful act by defendants after process issued. Gambocz, supra, 102 N.J. Super. at 130, 245 A.2d 507. Thus, Fleming cannot state a claim based upon UPS's offer to have him resign made prior to his arrest.
Fleming also contends that on one other occasion, at the start of the first day of his criminal trial, Fox offered to drop the criminal charges if Fleming resigned from employment. Kern testified that, in fact, he approached UPS representative Rogalsky in the presence of Fox and advised that Judge Conte had asked him to see if there was a way to settle the case. It was in that context that UPS advised Kern that it would drop the criminal charges if Fleming resigned. This was then communicated to, and rejected by, Fleming and his attorney.
UPS had a right to prosecute Fleming for what he did. "The legal pursuit of one's right, no matter what the motive of the promoter of the action, cannot be deemed illegal or inequitable." Simone, supra, 844 F.2d at 1039 (quoting Ash v. Cohn, 119 N.J.L. 54, 58, 194 A. 174 (Sup.Ct. 1937)). UPS certainly has an interest in taking all legal means against employees who steal its customers' goods and assault its other employees. Offering such an employee the opportunity to resign is consistent with UPS's legitimate interests in ensuring that their parting with that employee thereby becomes final. Therefore, the offer of resignation on the first day of trial does not constitute the requisite coercive or perverted act necessary for an abuse of process action. This is particularly so in this *160 case in which the offer was part of a chain of events set in motion by the Judge's request of the prosecutor to see if the case could be settled.

B. Plaintiff's Claims of Denial of a Speedy Trial Cannot Form the Basis of his Abuse of Process Claim.

Fleming's claim of denial of a speedy trial is not recognizable as an implied right of action under a constitution or case law. Fleming's factual allegations suggest that certain defendants abused the criminal process in deliberately delaying his criminal trial. He contends that: (1) too many prosecution witnesses were called, (2) Kern had appeared late for trial, (3) UPS personnel "spoonfed" Kern at the trial, (4) he received discovery in piecemeal fashion, (5) there were trial delays on one occasion because of someone's vacation schedule and on another because of the unavailability of an expert witness from California, and (6) UPS was pressing to have his discharge case heard by the Arbitration Panel.
These allegations, even if true, do not provide the requisite coercive or perverted acts necessary to maintain an abuse of process claim under applicable legal principles. No one can be faulted for putting on "too many witnesses." Defendants were entitled to present the strongest case possible; they were entitled to try to win that case. Indeed, one can just as easily fault Fleming's attorney for his lengthy cross-examination of those witnesses. Appearing late for a trial date, the prosecuting attorney's consultation with UPS representatives ("spoonfeeding"), and the allegation that some discovery was produced late, while they may not be models of prosecutorial efficiency, are not uncommon matters encountered in the course of litigation.
There are many times in the course of litigation when witnesses or principals are not available due to scheduling problems. Indeed, as Kern testified, the initial delay in starting trial was largely due to the unavailability of Fleming's attorney, *161 and that thereafter the primary problem throughout was the attempt to coordinate the schedules of the two attorneys and the judge (who was the judge for several municipalities as well as a practicing attorney). These matters do not give rise to an actionable claim for abuse of process.
Furthermore, with respect to UPS, Fox, and O'Keefe, it must be noted that Fleming asserts that the motive for these trial delays was UPS's desire to cause Fleming not to contest his discharge from employment. Ironically, Fleming recognizes that it was he who sought delays in his discharge arbitration proceeding and UPS who sought to proceed with it. UPS was obviously content to have Fleming continue to contest his discharge by virtue of the fact that they, not he, wanted to proceed to hearing on the contest discharge. Not only has Fleming failed to demonstrate the requisite coercive or perverted act subsequent to his arrest upon which to predicate a claim for abuse of process, he has also failed to demonstrate the requisite motive to sustain such an action.
Fleming argues that UPS's payment of a fee to Kern for his work in connection with State v. Fleming was the further act after issuance of process which perverted the legitimate use of the process. However, as Ethics Opinion 523 makes clear, the payments to Kern were permissible. Therefore, the payments do not constitute acts which pervert the use of lawfully issued process.
Fleming contends that failure to disclose such payment also perverted the use of lawfully issued process. Since the payments were proper, it is incumbent upon Fleming to identify some rule or duty which even required defendants to tell him anything about the fee arrangement with Kern. This he cannot do because defendants were under no such duty.
Fleming contends that even assuming the payments to Kern were proper, had he known sooner of those payments his counsel "might readily have altered his defense strategy in order to vindicate the plaintiff's rights." Counsel does not tell *162 this court what he would have done. Since the payments were proper, it does not matter to any legitimate defense strategy whether Kern was paid by Saddle Brook or UPS.
Fleming's Seventh Count abuse of process claim against UPS, Fox and O'Keefe is dismissed.

VIII.

PLAINTIFF'S SLANDER CLAIM IS TIME-BARRED, PRIVILEGED AND PREEMPTED UNDER SECTION 301 OF THE LABOR MANAGEMENT RELATIONS ACT, EXCEPT THOSE STATEMENTS MADE AFTER THE REVERSAL.
Fleming, in the Ninth Count of his complaint, alleges that certain defendants have made slanderous statements about him, in effect, accusing him of committing both theft and assault:
Since March 3, 1986, defendants United Parcel Service, Inc., Julio Castellanos, Dennis O'Keefe, Ronald Fox, William Rogalsky and Walter M.D. Kern have made and continue to make numerous statements to individuals in the area of the Township of Saddle Brook, accusing plaintiff of the crimes of stealing property and committing three assaults.
Fleming initially contended that the statements which formed the basis of his slander claim were made by Kern and the complaining witnesses during proceedings before both the Saddle Brook Municipal Court and the Arbitration Panel. He also complained that Fox made statements to Local 177 officers in the hallway of the courthouse during the criminal trial in Saddle Brook. These claims are barred by the statute of limitations and the doctrine of privilege. In his answering brief, Fleming does not address defendants' arguments as to these claims. Rather, he has asserted a new claim based upon an "eleventh hour" affidavit dated December 11, 1991, of James Tansey, the Business Agent for Teamsters Local 177 of which plaintiff was a member, which states:
While the trial was in progress, Mr. Fox [defendant] and Mr. Rogalsky [defendant] stated to me, and to others in my presence, that Mr. Fleming was a *163 thief and he stole those dresses. These comments were also made to me by them or in my presence to others even after his theft charge was reversed.
The theft conviction was reversed on March 15, 1989, less than one year prior to the filing of the instant complaint. Defendants contend that plaintiff's new slander claim based on the Tansey affidavit cannot stand.[5]
Fleming's slander claims for statements made before the reversal of his conviction are barred by the statute of limitations. N.J.S.A. 2A:14-3 requires that "[e]very action at law for a libel or slander shall be commenced within one (1) year next after the publication of the alleged libel or slander." Fleming's municipal court trial concluded in April of 1988. His discharge arbitration proceeding concluded in September of 1988. Fleming filed his complaint in this case on December 27, 1989, more than one year after the statements complained of.
Fleming's claims of slander before the reversal, had they been filed timely, would also be barred by the doctrine of privilege. Pleadings, court reports and statements issued in the context of a judicial proceeding are absolutely privileged. DeVivo v. Ascher, 228 N.J. Super. 453, 457, 550 A.2d 163 (App.Div. 1988), certif. den., 114 N.J. 482, 555 A.2d 607 (1989). This is also true of complaints filed in municipal court. Genito v. Rabinowitz, 93 N.J. Super. 225, 229, 225 A.2d 590 (App.Div. 1966).
Our Supreme Court noted that the most noteworthy illustration of the absolute privilege or immunity is that afforded in judicial proceedings where judges, attorneys, witnesses and parties are fully protected against defamation actions based upon utterances made in the course of judicial proceedings and having some relation thereto. Rainer's Dairies v. Raritan Valley Farms, Inc., supra, 19 N.J. at 558, 117 A.2d 889.
*164 Similarly, any state law claim for slander based on statements made to the Arbitration Panel[6] is preempted by Section 301 and the statements made are absolutely privileged. See Johnson v. Anheuser Busch, Inc., supra, 876 F.2d at 624-625; Hyles v. Mensing, 849 F.2d 1213, 1217 (9th Cir.1988); Hull v. Central Transport, Inc., 628 F. Supp. 784, 789 (N.D.Ind. 1986). Statements allegedly made by Fox to Local 177 officers (who had been informed previously of Fleming's discharge for dishonesty), who represented Fleming in connection with his discharge were obviously made to persons with a right to know the information communicated.
Tansey's affidavit establishes that he is a union officer with intimate knowledge of the events surrounding Fleming, to wit: his knowledge of Fleming's arrest, subsequent discharge, the trial, the related appeal of his theft conviction and his grievance. Moreover, Tansey was involved in Local 177's representation of Fleming pursuant to the grievance arbitration provisions of the collective bargaining agreement between UPS and Local 177. Defendants contend that as such, statements made by UPS supervisors, Fox and Rogalsky, both of whom were involved with Fleming's discharge and the grievance and arbitration proceedings, to a union official which relate to a dispute over an event occurring at the workplace which formed the basis for discharge and which are related to the grievance and arbitration provisions of the collective bargaining agreement, are preempted by Section 301. See Johnson v. Anheuser Busch, Inc., supra, 876 F.2d at 623-24.
However, under the bare allegation that Fox, after the reversal, continued to say that Fleming was a thief and stole those dresses appears to have no relationship to the grievance arbitration because the statements allegedly were repeated after the termination of all proceedings. The circumstances *165 surrounding such statements may at some later date warrant the defenses of privilege and/or truth.
Summary judgment will be granted on the Ninth Count in favor of all defendants for all statements made prior to the reversal. The motion to dismiss the allegations of slander allegedly made by Fox and UPS after the reversal is denied without prejudice.

IX.

THE TENTH COUNT OF PLAINTIFF'S COMPLAINT ALLEGING INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED BECAUSE IT IS TIME-BARRED AND BECAUSE PLAINTIFF HAS NOT ESTABLISHED THE ELEMENTS OF HIS CLAIM.
Fleming, in the Tenth Count of his complaint, alleges that as a result of the conduct of the defendants he has endured extreme humiliation and emotional distress requiring medical treatment. Presumably this is a claim for the intentional infliction of emotional distress.[7]
Fleming's emotional distress claim is a claim for an injury to the person, and therefore must be brought within two years of the resultant injury. Goncalvez v. Patuto, 188 N.J. Super. 620, 630, 458 A.2d 146 (App.Div. 1983). At his deposition, Fleming stated that he had suffered distress from "day one" following his arrest on March 3, 1986. However, he did not bring this action until December 27, 1989. Therefore, his emotional distress claim is time-barred.
*166 Fleming cannot bring an action for negligent infliction of emotional distress because the elements of such a claim are: (1) [t]he death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate family relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. Id. at 625, 458 A.2d 146 (quoting Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980)). Fleming has not pled, nor can he prove, the elements of such a claim.
Even if Fleming's claim had been timely filed, it fails because in order "to establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988); citing M. Minzer, Damages in Tort Actions, vol. 1, § 6.12 at 6-22 (1987) (Minzer). Fleming has demonstrated neither the requisite conduct by defendants, nor severe distress.
To recover, Fleming must prove that the defendants intended "both to do the act and to produce emotional distress." [Ibid. (Emphasis added)]. In the alternative, Fleming must show that the "high degree of probability that emotional distress will follow." Ibid.
Moreover, defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Ibid., (quoting Restatement 2d of Torts, § 46 comment (d) (1965)). Where, as here, probable cause existed to prosecute Fleming, he cannot show the kind of outrageous conduct on the part of defendants necessary to maintain his action.
Fleming has also failed to meet the damage element. While a plaintiff need not prove physical injury, "the emotional distress suffered ... must be `so severe that no *167 reasonable man could be expected to endure it'" Id. 111 N.J. at 366-367, 544 A.2d 857 (quoting Restatement, supra, § 46, comment (j)). It is for the court to determine as a matter of law whether the requisite level of emotional distress can reasonably be found. It is only after an affirmative finding by the court on this issue that the matter may proceed to trial. Id. at 367, 544 A.2d 857. This court cannot find that the distress was "so severe that no reasonable man could be expected to endure it."
Fleming, despite his claims of humiliation and emotional distress, never sought medical attention for these alleged problems. Fleming initially claimed that he could not afford medical treatment, but concedes that he never bothered to find out whether his wife's medical insurance (she had returned to work at AT & T) would cover such treatment. He then admitted that his failure to seek medical help was not based on a lack of funds, but rather on his belief that such help was unnecessary because it was pointless. Fleming reports only generalized nervousness, headaches and depression over loss of his job and inability to provide a paycheck for his family. Such generalized complaints have routinely been deemed insufficient as a matter of law to establish the damage element of such a claim. Id. at 367-68, 544 A.2d 857.
Since Fleming cannot establish the elements of a claim for the intentional infliction of emotional distress, the Tenth Count is dismissed.

X.

KERN IS ALSO ENTITLED TO PROSECUTORIAL IMMUNITY AND TORT CLAIM ACT IMMUNITY.
Defendant Walter M.D. Kern, who acted as municipal prosecutor of Saddle Brook, is alleged to have violated Fleming's *168 rights under Counts One, Three, Four, Five, Six, Seven, Nine and Ten of the complaint.
Kern is entitled to all the defenses available to the other defendants. As noted earlier in this opinion, Kern did not violate any ethical rule of the New Jersey Supreme Court in receiving compensation for prosecutorial services from a complaining party. See opinion 523.
As a prosecutor, Kern is entitled to prosecutorial immunity regardless of his motives. See, e.g., Imbler v. Pachtman, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976) (state prosecuting attorney); Bauers v. Heisel, 361 F.2d 581 (3d. Cir.1966), cert. den. 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967) (prosecuting attorney). He is also afforded immunity under N.J.S.A. 59:3-8 which states that:
[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial . . proceeding within the scope of his employment.
Kern is immune from suit and summary judgment is granted dismissing all counts of the complaint asserted against him.

XI.

CONCLUSION
The motions of defendants for summary judgment to dismiss the complaint are granted except for the Count Five claim of slander between the reversal, March 15, 1989, until December 17, 1989 against Mr. Fox and UPS.
NOTES
[1] Castellanos has not been served with process and is therefore not before the Court.
[2] Rogalsky died after commencement of this action and prior to service of process on him.
[3] Although the complaint indicates that Fleming's contractual rights are based on the "Union Constitution," at his deposition, both Fleming and his attorney stated that this was in error and the complaint should have referred to the Union contract, i.e., the collective bargaining agreement.
[4] Moreover, the Eighth Count is redundant of Fleming's Sixth Count because Fleming admits that he was arrested by the police. Where a defendant files a false complaint which "causes the issuance of a warrant upon which one is arrested [such actions do] not give rise to a cause of action for false imprisonment. The action must be one for malicious prosecution." Genito v. Rabinowitz, 93 N.J. Super. 225, 228, 225 A.2d 590 (App.Div. 1966). "Malicious prosecution remains the sole theory for redress for one who has been injured by the wrongful institution of suit." Devlin v. Greiner, 147 N.J. Super. 446, 469, 371 A.2d 380 (Law Div. 1977). Since the Eighth Count is redundant, it would have to be stricken in any event. R. 4:6-4(b)(2).
[5] The Tansey affidavit does not involve defendants O'Keefe or Kern. Therefore, they continue to be entitled to summary judgment on this Count. Furthermore, Rogalsky is deceased and is not before the court.
[6] Since the Arbitration Panel rendered its decision upholding Fleming's discharge in September 1988, this claim is barred by the statute of limitations.
[7] Additionally, if the Tenth Count is not intended as a claim for the tort of intentional infliction of emotional distress, but rather is merely added as a damage element to Fleming's other claims, it must be stricken because it is duplicative of ¶ 18 of the First Count, ¶ 6 of the Fourth Count, ¶ 4 of the Seventh Count, ¶ 6 of the Eighth Count and ¶ 7 of the Ninth Count. R. 4:4-6(b)(2).